UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| MINTO EXPLORATIONS LTD., | |
| Plaintiff, | 3:11-cv-00031 JWS |
| vs. | ORDER AND OPINION |
| PACIFIC AND ARCTIC RAILWAY AND NAVIGATION COMPANY, | [Re: Motions at Dockets 21 and 28] |
| Defendant. | |

## I. MOTIONS PRESENTED

At docket 21, plaintiff Minto Explorations Ltd. ("Minto") moves for summary judgment on Count I of its complaint pursuant to Federal Rule of Civil Procedure 56. At docket 27, defendant Pacific and Arctic Railway and Navigation Company ("PARN") opposes the motion for summary judgment. At docket 28, PARN cross-moves for summary judgment dismissing Count I. At dockets 41 and 42, Minto replies in support of its motion for summary judgment and responds in opposition to PARN's cross-motion for summary judgment. PARN replies in support of its cross-motion at docket 51. Oral argument on the cross-motions was heard on August 4, 2011.

## II.  BACKGROUND

Minto is a British Columbia corporation with its principal place of business in Yukon Territory, where it operates a copper ore mine.  PARN is an Alaska corporation and subsidiary of White Pass and Yukon U.S. Inc. ("White Pass").  PARN is the owner and operator of a dock open to the public in Skagway, Alaska.  Adjacent to the dock is a ship loader facility, which is connected to an ore terminal.  PARN is the prior owner of the ship loader facility and ore terminal.  In July 1990, PARN sold the ship loader facility and ore terminal to Alaska Industrial Development and Export Authority ("AIDEA") through a purchase agreement ("Purchase Agreement").

Section 1.10 of the Purchase Agreement states in pertinent part:

1.10 Use of Dock:

    (a)    Subject to (b) below, [PARN], in servicing AIDEA, its agents, or other users of the Purchased Assets, will use its best efforts to provide dockage to ore ships, at the Dock, in an expedient fashion and AIDEA, its agents and other users of the Purchased Assets will adhere to the rules and regulations relating to dockage of [PARN] and any regulatory authority having jurisdiction over the Dock.

    (b)    AIDEA, its agents, or other users of the Purchased Assets will have the right for the Term to use the Dock for ore ships arriving to load outgoing free flowing bulk mine products that will be loaded from the Terminal and for the purposes normally granted to users of the Dock in consideration of payment of the dockage charge and for the purpose of tying and untying ore ships and operating, repairing and maintaining the ship loader and for all related activities ....

    (c)    (i)    Except as provided in (ii) below, for ore ships arriving to load outgoing free flowing bulk mine products that will be loaded from the Terminal, AIDEA will pay or cause to be paid to [PARN] an all inclusive dockage charge at the then current ore ship tariff rates of [PARN] as posted at Skagway, Alaska, or on file with the appropriate government regulatory agency.

        (ii)    For ore ships arriving to load Curragh's outgoing free flowing bulk mine products, AIDEA will pay or cause to be paid to [PARN] an all inclusive dockage charge of $US 3.00 per foot per each period of 24 hours (with any partial periods considered a full 24 hours), plus (during the period October 1 to May 15 of each year) $US 0.25 per foot per each period of

> 24 hours (with any partial periods considered a full 24 hours), each escalated on January 1 of each year by the increase since the preceding January 1 in the Consumer Price Index, all items Seattle, Washington, which shall be the only charge payable for use of the Dock for Curragh's outgoing free flowing bulk mine products.

The Purchase Agreement further provides that it "shall be interpreted and construed in accordance with the laws of Alaska and shall be treated in all respects as an Alaskan contract."[1]

In January 2007, AIDEA and Minto entered into a user agreement for ore storage and loading facilities ("User Agreement"). Section 1(c) of the User Agreement states:

> c. Dock. All rights to use the Dock allowed under the Purchase Agreement, subject to AIDEA's right to allow Other Users to use the rights to use the Dock under the Purchase Agreement. To facilitate [Minto's] use of the Dock pursuant to the terms of the Purchase Agreement, AIDEA and [Minto] state that they intend [Minto] to be an "other user" under the provisions of paragraph 1.10 of the Purchase Agreement.

In a recital entitled "Limits on Use of Dock," the User Agreement also states,

> Under the terms of paragraph 1.10 of the Purchase Agreement, "AIDEA, its agents and other users ... have the right ... to use the Dock for ore ships arriving to load outgoing free flowing bulk mine products that will be loaded from [AIDEA's Facilities] and for the purposes normally granted to users of the Dock in consideration of the payment of the dockage charge and for the purpose of tying and untying ore ships, and operating, repairing and maintaining the Shiploader and for all related activities" but AIDEA's right to so use the Dock is subject to (1) an obligation to pay or cause to be paid all fees and charges imposed by others in connection with use of the Dock ("Dockage Charges")...[2]

The User Agreement further provides that the agreement "shall be governed by and construed in accordance with the laws of the State of Alaska."[3]

On October 25, 2007, Minto shipped copper ore from Skagway with a vessel tied up to PARN's dock. After the shipment, PARN delivered an invoice to Minto with a

---

[1] Doc. 19-1 at p. 19.

[2] Doc. 19-4 at p. 2.

[3] Doc. 19-5 at p. 10.

wharfage charge. For every shipment of copper ore from Skagway, PARN delivered an invoice to Minto with a wharfage fee.

To date, Minto has paid PARN $117,617 in wharfage. Minto has not paid PARN for wharfage invoices totaling $64,473. Minto has deposited $165,124.91 into an escrow account at First National Bank of Alaska, representing wharfage due on ore shipments beginning August 2009, and continues to deposit wharfage charges into the escrow account.

On March 4, 2011, Minto filed a complaint alleging three claims against PARN: 1) breach of contract; 2) discrimination in violation of AS 42.30.020; and 3) a claim for a declaratory judgment. The parties now cross-move for summary judgment on Minto's breach of contract claim.

### III. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if there is no genuine dispute as to material facts and if the moving party is entitled to judgment as a matter of law. The moving party has the burden of showing that there is no genuine dispute as to material fact.[4] The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[5] Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[6] All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[7]

---

[4]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[5]*Id.* at 323-25.

[6]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

[7]*Id.* at 255.

## IV.  DISCUSSION

The parties cross-move for summary judgment on Count I of Minto's complaint. Count I alleges that PARN's "demand and invoices for wharfage charges are in breach of its obligations under the Purchase Agreement,"[8] which provides for payment of "an all inclusive dockage charge."  It is undisputed that Minto is a third-party beneficiary of the Purchase Agreement.[9]

Minto argues that PARN is in breach of the Purchase Agreement because it has billed and continues to charge Minto a wharfage fee in addition to a dockage fee.   Minto argues that the term "all inclusive dockage charge" in Section 1.10(c)(i) does not contemplate a separate additional charge for wharfage.  Minto further contends that under Alaska's principles of contract interpretation, the language "all inclusive dockage charge" means that PARN "can only collect $4.00 per foot of overall length (as is the current rate provided in its tariff), and PARN's demands for an additional charge of $2.00 per ton of ore concentrate for wharfage is a breach of the Purchase Agreement."[10]

PARN argues that it is entitled to summary judgment dismissing Count I because "under federal principles of maritime contract interpretation, 'all inclusive dockage charge at the then current ore ship tariff rates' means all tariff charges for using PARN's dock."[11]  PARN also argues that under maritime law "dockage" and "wharfage" are synonymous terms that mean "use of a dock."[12]

Before interpreting the meaning of "an all inclusive dockage charge at [PARN's] then current ore ship tariff rates," the court must first determine whether Alaska law or maritime law applies.  Minto contends that Alaska law applies because the Purchase Agreement provides that it "shall be interpreted and construed in accordance with the

---

[8]Doc. 1 at p. 4.

[9]Doc. 28 at p. 11.

[10]Doc. 41 at p. 2.

[11]Doc. 28 at p. 3.

[12]*Id.* at p. 2.

laws of Alaska and shall be treated in all respects as an Alaskan contract."[13]  Minto further argues that the contract is not a maritime contract because it pertains to the purchase of real property.

PARN argues that maritime law applies because the Purchase Agreement is a land-based maritime contract.  PARN further contends that Alaska law would "look to maritime law to define and interpret 'dockage' and 'wharfage' because it has never defined these terms or decided a maritime tariff dispute."[14]

In order to decide the choice of law issue, the court must first determine whether its jurisdiction over the subject matter of this action "derives from the diversity of citizenship of the parties, or from the maritime nature of the contract sued on."[15]  "[A] federal court sitting in diversity applies the choice-of-law rules of the forum state, whereas a federal court sitting in admiralty must apply federal maritime choice-of-law rules."[16] "In the absence of a contractual choice-of law clause, federal courts sitting in admiralty apply federal maritime choice-of-law principles derived from the Supreme Court's decision in *Lauritzen v. Larsen,* 345 U.S. 571 [], and its progeny."[17]  "But where the parties specify in their contractual agreement which law will apply, admiralty courts will generally give effect to that choice."[18]

Minto's complaint alleges diversity jurisdiction, while PARN contends that the court has admiralty jurisdiction over the breach of contract claim because the Purchase Agreement is a maritime contract.  "As a general rule, admiralty law applies to all maritime contracts."[19]  Assuming the court has admiralty jurisdiction, Alaska law would

---

[13]Doc. 19-1 at p. 19.

[14]Doc. 51 at p. 7.

[15]*Aqua-Marine Constructors, Inc. v. Banks*, 110 F.3d 663, 670 (9th Cir. 1997).

[16]*Aqua-Marine Constructors*, 110 F.3d at 670 (internal citations omitted).

[17]*Chan v. Society Expeditions, Inc.*, 123 F.3d 1287, 1296 (9th Cir. 1997).

[18]*Chan*, 123 F.3d at 1296.

[19]*Aqua-Marine Constructors*, 110 F.3d at 670.

apply because the parties specified in the Purchase Agreement that it "shall be interpreted and construed in accordance with the laws of Alaska and shall be treated in all respects as an Alaskan contract."[20] The User Agreement also provides that it "shall be governed by and construed in accordance with the laws of the State of Alaska."[21]

If the court has diversity jurisdiction over the breach of contract claim, the court must apply the choice-of-law rules of the forum state Alaska. Under Alaska law, "[w]here, as here, the parties' contract includes a choice-of-law provision, Restatement § 187 applies."[22] Section 187 provides in pertinent part that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Here, the parties have chosen Alaska law to govern their contractual rights and duties, and the meaning of "dockage fee" could have been resolved by an explicit provision in the Purchase Agreement. Accordingly, whether the court has diversity jurisdiction or admiralty jurisdiction over Minto's breach of contract claim, the result is the same - Alaska contract law applies.

Under Alaska law, "[t]he goal of contract interpretation is to give effect to the parties' reasonable expectations, which [the court] assess[es] by examining the language of the disputed provisions, the language of other provisions, relevant extrinsic evidence, and case law interpreting similar provisions."[23] "In reaching a reasonable interpretation of a contact, [the court] attempt[s] to give effect to all of its terms, if possible."[24] The court "consider[s] disputed language within the context of the whole contract and its purposes, and the circumstances surrounding its formation."[25]

---

[20]Doc. 19-1 at p. 19.

[21]Doc. 19-5 at p. 10.

[22]*Long v. Holland America Line Westours, Inc.*, 26 P.3d 430, 432 (Alaska 2001).

[23]*Matanuska Elec. Ass'n, Inc. v. Chugach Elec. Ass'n, Inc.*, 99 P.3d 553, 562 (Alaska 2004).

[24]*Matanuska Elec.*, 99 P.3d at 562.

[25]*Id.*

"Questions of contract interpretation generally raise questions of law."[26] "Fact questions may be created if the meaning of the contract language depends on conflicting extrinsic evidence."[27]

At issue is the meaning of the phrase "an all inclusive dockage charge at the then current ore ship tariff rates of [PARN] as posted at Skagway, Alaska." Minto focuses on the first part of the phrase - "an all inclusive dockage charge" - and argues that "all inclusive dockage charge" means the per foot dockage or berthage fee set forth in PARN's posted tariff rates. PARN focuses on the latter part of the phrase - "at the then current ore ship tariff rates" - and contends that "then current ore ship tariff rates" implies that multiple tariffs apply to ore ships.

The term "all inclusive dockage charge" appears two times in the Purchase Agreement. First, Section 1.10(c)(i), which applies to all ore ships "arriving to load outgoing free flowing bulk mine products that will be loaded from the Terminal," except for Curragh ore ships, provides for "an all inclusive dockage charge at the then current ore ship tariff rates of While Pass as posted at Skagway, Alaska, or on file with the appropriate government regulatory agency." Second, Section 1.10(c)(ii), which applies only to Curragh ore ships, provides for "an all inclusive dockage charge of $US 3.00 per foot for each period of 24 hours (with any partial periods considered a full 24 hours), plus (during the period October 1 to May 15 of each year) $US 0.25 per foot per each period of 24 hours (with any partial periods considered a full 24 hours), each escalated on January 1 of each year of the increase since the preceding January 1 in the Consumer Price Index."[28] In addition, Section 1.10(b) provides that "other users" will have the right "to use the Dock for ore ships arriving to load outgoing free flowing bulk mine products that will be loaded from the Terminal and for the purposes normally granted to users of the Dock in consideration of payment of the dockage charge."[29] All

---

[26] *Beal v. McGuire,* 216 P.3d 1154, 1162 (Alaska 2009).

[27] *Beal*, 216 P.3d at 1162.

[28] Doc. 19-1 at p. 10.

[29] Doc. 19-1 at p. 24.

three sections refer to a dockage charge: none refer to a wharfage fee for use of the Dock.

Moreover, the User Agreement Minto executed with AIDEA provides in pertinent part that AIDEA and Minto as an "other user" have "the right to use the Dock for ore ships arriving to load outgoing free flowing bulk mine products that will be loaded from [AIDEA's Facilities] and for the purposes normally granted to users of the Dock in consideration of the payment of the dockage charge."[30] The above provision also refers only to a dockage charge, not a wharfage fee.

Reading the above provisions together, it is reasonable to interpret the Purchase Agreement as providing one all inclusive dockage rate for Curragh ore ships of a set per foot fee which escalates yearly, and another all inclusive per foot dockage fee for all other ore ships at PARN's then current tariff rates as posted at Skagway. This interpretation is consistent with the fact that when AIDEA and PARN executed the Purchase Agreement, AIDEA purchased the equipment used to transport ore from the terminal facility to the vessels at the dock. Interpreting "all inclusive dockage charge at the then current tariff rates" as allowing PARN to charge an additional wharfage fee is unreasonable because PARN no longer owns the shiploader through which the ore passes. The proposition that AIDEA would agree to pay PARN a wharfage fee so that it could use loading equipment AIDEA purchased from PARN is so contrary to AIDEA's interest as to be preposterous.

To determine the contracting parties' intentions, the court also looks to "extrinsic evidence regarding the parties' intent at the time the contract was made."[31] In attempting to give effect to the parties' intent, the court generally looks to express manifestations of each party's understanding of the contract, including their conduct after entering into the contract.[32] PARN was unable to provide evidence of the tariff

---

[30]Doc. 19-4 at p. 2.

[31]*Sprucewood Inv. Corp. v. Alaska Housing Finance Corp.*, 33 P.3d 1156, 1162 (Alaska 2001).

[32]*Sprucewood*, 33 P.3d at 1162 (quoting *Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981).

rates it imposed on ore ships using the Dock from July 1990, when PARN and AIDEA executed the Purchase Agreement, until October 2007, when Minto's ore ships began using the Dock.[33] However, at oral argument, the parties agreed that from July 1990 until 1994, Curragh was the sole ore shipper using the Dock and PARN charged Curragh an all inclusive dockage fee based on vessel length, but no wharfage fee. In addition, Minto provided undisputed evidence that from 1996 to 2000, PARN charged another ore shipper using the Dock a per foot dockage fee and no wharfage fee per ton of ore concentrate. The declaration of Thomas D. Cochran, states that in his position as White Pass's Port Manager, he invoiced all vessels docking at White Pass facilities in the Port of Skagway from 1996 to 2000. Cochran further states that from 1996 to 2000 "[c]harges to bulk carriers calling on the port of Skagway included dockage at $2.10 per foot of vessel length overall per 24 hours" and that "[n]o per ton fee on ore concentrate was ever assessed during [his] tenure as port manager."[34] PARN proffered declarations indicating that from 2005 to 2011, PARN charged vessels using the Dock its posted tariff rates based on the length of vessel, type of vessel, services the vessel used, and number of passengers on the vessel, and that the posted tariff rates included charges for berthage, services, wharfage, and port & security fees."[35]

      The parties' proffered declarations do not constitute conflicting extrinsic evidence. To the contrary, they show that from 1990 to at least 2000, PARN charge ore shippers only a per foot dockage fee based on vessel length, and that by 2005, PARN had changed its practice of charging ore shippers only a dockage fee and began charging them both a dockage fee and a wharfage fee. PARN's conduct for the first ten years after entering the Purchase Agreement is an express manifestation that at the time PARN and AIDEA executed the Purchase Agreement they intended that ore shippers using the Dock would be charged a per foot dockage fee based on vessel length, and not an additional wharfage fee per ton of ore concentrate.

---

[33]Doc. 54.

[34]Doc. 18 at p. 2.

[35]Docs. 29, 30, and 54.

PARN's argument that dockage actually means wharfage is unavailing. The definition of wharfage set forth on PARN's posted tariff rates for 2011 states that "[w]harfage is the charge assessed against the cargo passing or conveyed over, onto, or under wharves or between vessels ... when berthed at a wharf or when moored in a slip adjacent Wharf. Wharfage is solely the charge for use of the wharf and does not include charges for any other service."[36] If dockage is synonymous with wharfage, then it is arguable that based on the PARN's posted tariff rates, PARN should only be charging Minto a per ton fee, rather than a wharfage fee and a berthage fee.[37]

Based on the plain language of the disputed provision, the language of other provisions in the Purchase Agreement, and relevant extrinsic evidence, the court concludes that "an all inclusive dockage charge at the then current ore ship tariff rates" means the per foot dockage or berthage fee as currently posted by PARN, and does not include a wharfage fee. Consequently, PARN has breached the Purchase Agreement by charging Minto a wharfage fee in addition to a dockage fee, and Minto is entitled to summary judgment in its favor on Count I.

## V. CONCLUSION

For the reasons set out above, Minto's motion at docket 21 for partial summary judgment is **GRANTED**, and PARN's cross-motion at docket 28 for partial summary judgment is **DENIED**.

DATED at Anchorage, Alaska, this 12th day of August 2011.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

---

[36] Doc. 11-1 at p.1.

[37] PARN's posted tariff rates for 2011 do not include a per foot dockage fee, but rather a per foot berthage fee.